**UNITED STATES DISTRICT COURT**
**NORTH DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| SUPER 8 WORLDWIDE, INC., f/k/a Super 8 Motels, Inc., a South Dakota Corporation, | : |
| Plaintiff, | : |
| v. | : |
| AMERICAN LODGING PARTNERS, INC., an Illinois Corporation, VIVAK KHANNA, DHARAM VIR, and DESH MEHTA, | : |
| Defendants. | : |

FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW
JFB

Civil Action No. _____

**VERIFIED COMPLAINT**

Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., by and through counsel, complaining of defendants American Lodging Partners, Inc., Vivak Khanna, Dharam Vir, and Desh P. Mehta, state as follows:

**PARTIES AND SUBJECT MATTER JURISDICTION**

1.     Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc. ("SWI") is a corporation organized and existing under the laws of the State of South Dakota with its principal place of business in Parsippany, New Jersey.

2.     Defendant American Lodging Partners, Inc. ("ALP"), on information and belief, is a corporation organized and existing under the laws of the State of Illinois, with its registered agent and office located at 12808 South Ashland Avenue, Calumet Park, Illinois 60827.

3.     Defendant Vivak Khanna, a.k.a. Vivek Khanna, ("Khanna"), upon information and belief, is the President of ALP, and resides or transacts business at 155 North Harbor Drive, #3407, Chicago, Illinois 60601.

4.     Defendant Dharam Vir ("Vir"), upon information and belief, is a principal or officer of ALP, and resides or transacts business at 211 Sisters Avenue, Naperville, Illinois 60564.

5.    Defendant Desh P. Mehta ("Mehta"), upon information and belief, is a principal or officer of ALP, and resides or transacts business at 6200 N. Fieldtree Ct., Peoria, Illinois 61615.  Khanna, Vir and Mehta are referred to herein as the "Individual Defendants."

6.    The amount in controversy in this matter, exclusive of interests and costs, exceeds the sum of $75,000.

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and 15 U.S.C. § 1121.

8.    This Court has personal jurisdiction over Defendants, and venue is proper in this District, as Defendants are Illinois citizens, transact business and/or have a registered agent in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Super 8 Marks

9.    SWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

10.    SWI has the exclusive right to sublicense the use of various trade names and service marks (which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Super 8 Marks"), as well as the distinctive Super 8® System, which provides hotel services to the public under the Super 8 name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

11.    SWI or its predecessors have continuously used each of the Super 8 Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

12.     SWI has given notice to the public of the registration of the Super 8 Marks as provided in 15 U.S.C. § 1111.

13.     SWI uses or has used the Super 8 Marks as abbreviations of its brand name.

14.     Through its franchise system, SWI markets, promotes, and provides services to its guest-lodging franchisees throughout the United States.  In order to identify the origin of their guest-lodging services, SWI allows its franchisees to utilize the Super 8 Marks and to promote the Super 8 brand name.

15.     SWI has invested substantial effort over a long period of time, including the expenditure of millions of dollars to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Super 8 Marks as distinctly designating SWI guest lodging services as originating with SWI.

16.     The value of the goodwill developed in the Super 8 Marks does not admit of precise monetary calculation, but because SWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of SWI's goodwill exceeds hundreds of millions of dollars.

17.     The Super 8 Marks are indisputably among the most famous in the United States.

<u>The Agreement Between the Parties</u>

18.     On or about November 30, 2004, SWI entered into a license agreement with ALP (the "License Agreement") for the operation of a guest-lodging facility located at 12808 S. Ashland Avenue, Calumet Park, IL 60827, Site No. 8592-82945-2 (the "Facility"), during which ALP was permitted to use the Super 8 Marks in connection with the operation and use of the Facility.  A true and correct copy of the License Agreement is attached hereto as Exhibit A and is incorporated by reference as if fully set forth herein.

19.    The License Agreement was executed on behalf of ALP by Khanna, whose signature was attested to by Vir.

20.    Pursuant to section 5 of the License Agreement, ALP was obligated to operate a Super 8® guest-lodging facility for a twenty-year term.

21.    Pursuant to section 7 and Schedule C of the License Agreement, ALP was required to make certain periodic payments to SWI for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively "Recurring Fees").

22.    Pursuant to section 7.3 of the License Agreement, ALP agreed to pay interest at the rate of 1.5% per month, or the maximum rate permitted by applicable law, whichever is less, on any invoice received from SWI for past due amounts owed under the License Agreement.

23.    Pursuant to sections 3.8 and 4.8 of the License Agreement, ALP agreed to maintain accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and agreed to allow SWI to examine, audit, and make copies of the entries in these books, records, and accounts.

24.    Pursuant to section 11.2 of the License Agreement, ALP could terminate the Franchise Agreement, with notice to ALP, for various reasons, including ALP's (a) failure to pay any amount due SWI under the License Agreement, (b) failure to remedy any other default of its obligations or warranties under the License Agreement after receipt of written notice from SWI specifying one or more defaults under the License Agreement, and/or (c) receipt of two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured.

25.    Pursuant to section 12.1 of the License Agreement, ALP agreed that, in the event of termination of the License Agreement pursuant to any breach of the covenants and agreements

contained in the License Agreement, it would pay Liquidated Damages to SWI in accordance with the specified formula within thirty (30) days of termination.

26.     Section 13 of the License Agreement specified ALP's obligations in the event of a termination of the License Agreement, including its obligation to immediately cease using all of the Super 8 Marks.

27.     Pursuant to section 17.4 of the License Agreement, ALP agreed that in the event that SWI was required to take action to enforce the License Agreement, the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement."

28.     On or about November 30, 2004, SWI and ALP executed a Satellite Connectivity Services Addendum (the "Services Addendum").   A true and accurate copy of the Services Addendum is attached hereto as Exhibit B.

29.     Pursuant to section 13(c) of the Services Addendum, ALP agreed that in the event of termination, it would pay damages to SWI in the amount of $1,000.00 within ten (10) days following the date of termination.

30.     Effective as of the date of the License Agreement, Khanna, Vir and Mehta provided SWI with a Guaranty of ALP's obligations under the License Agreement ("Guaranty"). A copy of the Guaranty is attached hereto as Exhibit C and is incorporate by reference as if fully set forth herein.

31.     Pursuant to the terms of the Guaranty, Khanna, Vir and Mehta agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause [ALP] to perform, each unpaid or unperformed obligation of Franchisee under the [License] Agreement."

32.     Under the Guaranty, Khanna, Vir and Mehta "acknowledge[d] that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution and WAIVER OF JURY TRIAL, applies to this Guaranty."

Defendants' Default Under the License Agreement and Guaranty

33.     On March 30, 2006, SWI sent ALP a letter advising that it was in default of the License Agreement by failing to pay Recurring Fees and other charges owed in exchange for ALP's right to operate its Facility under the License Agreement, in the amount of $56,075.37.  A true and correct copy of the March 30, 2006 letter is attached hereto as Exhibit D and is incorporated by reference as if fully set forth herein.

34.     In the March 30, 2006 letter from SWI, ALP was given 30 days to pay amounts owed to SWI, and was advised that a failure to pay the amounts owed within the time permitted could result in a termination of the License Agreement.  Khanna, Dir and Mehta, as guarantors, were also sent copies of the March 30, 2006 letter.

35.     Thereafter, on July 10, 2006, SWI sent ALP a second letter advising that ALP remained in default of the License Agreement by failing to pay Recurring Fees and other charges owed in exchange for ALP's right to operate its Facility under the License Agreement, in the amount of $100,784.44.  A true and correct copy of the July 10, 2006, letter is attached hereto as Exhibit E and is incorporated by reference as if fully set forth herein.

36.     In the July 10, 2006, letter from SWI, ALP was given an additional 30 days to pay amounts owed to SWI, and was again advised that a failure to pay the amounts owed within the time permitted could result in a termination of the License Agreement.  Khanna, Vir and Mehta were again copied on the July 10, 2006 letter.

37.     On August 11, 2006, SWI sent ALP a third letter advising ALP that the License Agreement had been terminated, effective August 11, 2006 as a result of ALP's failure to cure its

financial defaults and to pay amounts owed under the License Agreement.  A true and correct copy of the August 30, 2006 letter is attached hereto as Exhibit F and is incorporated by reference as if fully set forth herein.

38.    In the August 11, 2006 letter, SWI advised ALP of its obligations as a result of the termination of the License Agreement, including ALP's obligation to pay $216,788.40 in Liquidated Damages as provided in section 12.1 of the License Agreement and all outstanding Recurring Fees, estimated at the time to equal $118,156.28.   Khanna, Vir and Mehta were again copied on the August 11, 2006 letter.

39.    As a result of the termination of the License Agreement, ALP was required to completely de-identify the Facility as a Super 8 within fourteen (14) days of termination, including removing all signage and other items bearing the Super 8 Marks and all listings in directories and similar guides in which the Facility was identified as a Super 8.

40.    The termination of the License Agreement precluded ALP from any further use of the Super 8 Marks in or around the Facility.

41.    The termination of the License Agreement precluded ALP from any further use of the Super 8 Marks to induce the traveling public to use the Facility in any way.

42.    Upon information and belief, subsequent to the termination of the License Agreement, ALP continued to use the Super 8 Marks to induce the traveling public to rent guest rooms at the Facility.

43.    Upon information and belief, subsequent to the termination of the License Agreement, ALP used the Super 8 Marks without authorization to rent rooms through, among other things, failing to remove Super 8 signage and continuing to identify the Facility as a Super 8 guest lodging facility in response to telephone inquiries as to whether or not the Facility is a Super 8.

44.    By letter dated February 14, 2007, a true copy of which is attached hereto and incorporated by reference as Exhibit G, ALP reiterated ALP's post-termination obligations under the License Agreement, including the requirement that, upon termination, ALP completely de-identify the facility as a Super 8.

45.    Upon information and belief ALP continued to misuse the Super 8 Marks despite receiving notification from SWI to cease and desist from the misuse of the Super 8 Marks.

46.    Because ALP continued to misuse the Super 8 Marks, SWI was forced to pay to have signs displaying the Super 8 Marks removed from the Facility.  *See* invoice of Persona attached hereto and incorporated by reference as Exhibit H.

47.    Despite being given notices of its monetary default under the License Agreement, and despite being provided multiple opportunities to cure said default, as of the filing of this Complaint, ALP has failed to timely pay any damages or Recurring Fees to cure its default. Moreover, Khanna, Vir and Mehta have failed to fulfill their respective obligations under the Guaranty.

48.    For its part, SWI has satisfied all of its obligations under the License Agreement and the Guaranty.

## **COUNT I**

49.    SWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 48 of the Verified Complaint.

50.    Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant – use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection

with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant. . . ."

51.     ALP marketed, promoted, and rented the Facility through the unauthorized use of the Super 8 Marks, after the termination of the License Agreement, and such use caused confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

52.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of ... goods [or] services ... shall be liable in a civil action. ..."

53.     The acts of ALP in marketing, promoting, and renting rooms at the Facility, through and with the Super 8 Marks, constitute:

        (a)      a false designation of origin;

        (b)      a false and misleading description of fact; and

        (c)      a false and misleading representation of fact;

that caused confusion, mistake, or deception, as to the affiliation of ALP's Facility with SWI, and caused confusion, mistake, and deception, to the effect that SWI sponsored or approved of the guest lodging services that ALP provided at the Facility, all in violation of Section 43(a) of the Lanham Act.

54.     ALP's post-termination use of the Super 8 Marks in connection with goods and services at the Facility, after the Super 8 Marks became famous, caused dilution and disparagement of the distinctive quality of the Super 8 Marks, and lessened the capacity of the

Super 8 Marks to identify and distinguish the goods and services of SWI, all in violation of Section 43(c) of the Lanham Act.

Wherefore, pursuant to 15 U.S.C. §§ 1114 and 1125, SWI demands judgment against ALP, granting SWI compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## COUNT II

55.    SWI repeats and makes a part hereof, each and every allegation contained in paragraphs 1 through 54 of the Complaint.

56.    Pursuant to sections 3.8 and 4.8 of the License Agreement, ALP agreed to allow SWI to examine, audit, and make copies of its financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

57.    ALP has engaged in acts and practices, as described, which amount to infringement of the Super 8 Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

58.    As a result, ALP owes restitution and the disgorgement of profits, in an amount unknown to SWI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from ALP.

59.    Moreover, the calculation of the monetary amounts sought by SWI in this action is based on the gross room revenue information supplied by ALP and, to the extent there has been non-reporting, SWI's estimate as to the gross room revenue earned by ALP.

60.    The accuracy of this information cannot be either ascertained or confirmed without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from ALP.

Wherefore, SWI demands judgment ordering that ALP account to SWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Super 8 Marks.

## COUNT III

61.    SWI repeats and makes a part hereof, each and every allegation contained in paragraphs 1 through 60 of the Complaint.

62.    The License Agreement was terminated August 11, 2006.

63.    Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement pursuant to any breach of the covenants and agreements contained in the License Agreement, ALP shall pay Liquidated Damages to SWI as specified in section 12.1 of the License Agreement within thirty (30) days of termination.

64.    As a result of the premature termination of the License Agreement, ALP is obligated to pay SWI Liquidated Damages in the amount of $216,788.40 as calculated pursuant to sections 12.1 of the License Agreement.

65.    Notwithstanding SWI's demand for payment, ALP has failed to pay SWI the Liquidated Damages as required in section 12.1 of the License Agreement.

66.    SWI has been damaged by ALP's failure to pay Liquidated Damages.

67.    Section 13 of the Services Addendum provides that, in the event of early termination, ALP is obligated to pay SWI Addendum Liquidated Damages in the amount of $1,000.00 within ten (10) days of termination.

68.    Notwithstanding SWI's demand for payment, ALP has failed to pay SWI the Addendum Liquidated Damages as required by Section 13 of the Addendum.

69.    SWI has been damaged by ALP's failure to pay Addendum Liquidated Damages.

Wherefore, SWI demands judgment against ALP for Liquidated Damages in the amount of $216,788.40 and Addendum Liquidated Damages in the amount of $1,000.00, together with interest, attorneys' fees and costs of suit.

## COUNT IV

70.     SWI repeats and makes a part hereof, each and every allegation contained in paragraphs 1 through 69 of the Complaint.

71.     By virtue of the premature termination of the License Agreement, SWI sustained a loss of future revenue over the remainder of the twenty-year term of the License Agreement.

72.     If the Court determines that ALP is not liable to pay SWI liquidated damages as required by section 12.1 of the License Agreement then, in the alternative, ALP is liable to SWI for actual damages for the premature termination of the License Agreement.

73.     SWI has been damaged by ALP's breach of its obligation to operate a Super 8 guest lodging facility for the remaining term of the License Agreement.

Wherefore, SWI demands judgment against ALP for actual damages in an amount to be determined at trial, together with interest, attorneys' fees and costs of suit.

## COUNT V

74.     SWI repeats and makes a part hereof, each and every allegation contained in paragraphs 1 through 73 of the Complaint.

75.     Pursuant to section 7 and Schedule C of the License Agreement, ALP was obligated to remit Recurring Fees to SWI.

76.     Despite its obligation to do so, ALP has failed to remit certain of the Recurring Fees due and owing under the License Agreement in the amount of $160,474.62, as of August 4, 2008.

77.    ALP's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged SWI.

Wherefore, SWI demands judgment against ALP for the Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees and costs of suit.

## COUNT VI

78.    SWI repeats and makes a part hereof, each and every allegation contained in paragraphs 1 through 77 of the Complaint.

79.    Pursuant to section 7 and Schedule C of the License Agreement, ALP was obligated to remit Recurring Fees to SWI.

80.    Despite its obligation to do so, ALP has failed to remit certain of the Recurring Fees due and owing under the License Agreement in the amount of $160,474.62, as of August 4, 2008.

81.    In addition, ALP benefited from its wrongful use of the Super 8 Marks after the termination of the License Agreement and paid no royalty or other Recurring Fees to SWI in return for that benefit.

82.    ALP's failure to compensate SWI for its use of the Super 8 Marks constitutes unjust enrichment and has damaged SWI.

Wherefore, SWI demands judgment against ALP for the Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees and costs of suit, and all royalties and other Recurring Fees that should be paid to compensate SWI for the period during which ALP misused the Super 8 Marks and was thereby unjustly enriched, together with interest and costs of suit.

## COUNT VII

83.    SWI repeats and makes a part hereof, each and every allegation contained in paragraphs 1 through 82 of the Complaint.

84.    Pursuant to the terms of the Guaranty, Khanna, Vir and Mehta agreed, among other things, that upon a default under the License Agreement, they would immediately make each payment and perform each obligation required of ALP under the License Agreement.

85.    Despite their obligation to do so, Khanna, Vir and Mehta have failed to make any payments or perform or cause ALP to perform its obligations under the License Agreement.

86.    Pursuant to the Guaranty, Khanna, Vir and Mehta are liable to SWI for ALP's Liquidated Damages in the amount of $216,788.40, Addendum Liquidated Damages in the amount of $1,000.00, or actual damages in an amount to be determined at trial, and ALP's Recurring Fees due and owing under the License Agreement in the amount of $160,474.62, as of August 4, 2008, the precise amount to be determined at trial, and for those additional Recurring Fees attributable to the period during which ALP misused the Super 8 Marks.

Wherefore, SWI demands judgment against Khanna, Vir and Mehta for damages in the amount of:

(a)    All liquidated damages or actual damages and Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees and costs of suit; and

(b)    All profits, royalties, and other Recurring Fees that should be paid to compensate SWI for the period during which ALP misused the Super 8 Marks and was thereby unjustly enriched, together with interest, attorneys' fees and costs of suit.

COZEN O'CONNOR


By:   s/ Bruce M. Lichtcsien
      Bruce M. Lichtcsien      Bar # 6204943
      blichtcsien@cozen.com
      222 South Riverside Plaza
      Suite 1500
      Chicago, Illinois  60606
      (312) 382-3153
      (312) 706-9753 (Facsimile)

        - and -

ARMSTRONG TEASDALE LLP


      Edward R. Spalty  MO Bar #26086***
      espalty@armstrongteasdale.com
      direct fax:  816-329-5415
      *(to be admitted Pro Hac Vice)*
      David A. Jermann  MO Bar #51389***
      djermann@armstrongteasdale.com
      direct fax:  816-329-5426
      *(to be admitted Pro Hac Vice)*
      2345 Grand Boulevard, Suite 2000
      Kansas City, Missouri 64108-2617
      (816) 221-3420

      ***To be admitted Pro Hac Vice

      ATTORNEYS FOR SUPER 8 WORLDWIDE,
      INC.

## VERIFICATION

STATE OF NEW JERSEY          )
                             ) ss:
COUNTY OF MORRIS             )

Valerie Capers Workman, of full age, being duly sworn according to law, upon her oath, deposes and says:

1.      I am Vice President, Franchise Administration, of Super 8 Worldwide, Inc. ("SWI"), which is plaintiff in this action.

2.      I have read the foregoing Complaint and all the allegations contained therein. Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Complaint are true based on my personal knowledge, the records of SWI or information available through employees of SWI.

_____
Valerie Capers Workman

Sworn and subscribed to before me this 4th day of August, 2008.

_____
Notary Public

My Commission expires:

NISREEN FADIL FADDOUL
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 8/16/2009

```
FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW

JFB
```

# EXHIBIT A

ation: Calumet Park, IL
E..ity No. 82945
Unit No.: 8592

# SUPER 8 MOTELS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated NOV 30, 200 4, is between SUPER 8 MOTELS, INC., a South Dakota corporation ("we", "our" or "us"), and **AMERICAN LODGING PARTNERS, INC., an Illinois Corporation** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to CAL PARK PARTNERS, LLP, an Illinois Limited Liability Partnership ("Prior Franchisee") in a Franchise Agreement with us dated **September 22, 1995** (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Franchisee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, System Assessment Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement. You acknowledge that you must pay a retraining fee to us for updating the Facility's property management information system.

1. **License.** We have the exclusive right to license and franchise to you the distinctive "Super 8" System for providing economy lodging motel services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The License is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Super 8 Motel" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

2. **Protected Territory.** We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility of the same name (Super 8 Motel) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory (other than the Facility) unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located with the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.

1

**3.    Your Improvement and Operating Obligations.**   Your obligations to improve, operate and maintain the Facility are:

3.1    **Improvements.**  You must select and acquire the Location and the Facility and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities.  You must begin improvement of the Facility no later than thirty (30) days after the Effective Date.  The Facility must score 200 or fewer points (or equivalent score under a successor quality assurance scoring system we employ), within ninety (90) days after the Effective Date.  You must thereafter continue renovation and improvement of the Facility as the Punch List requires and pass any related quality assurance inspection within nine (9) months after the Effective Date.  All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement.  Your general contractor or you must carry the insurance required under this Agreement during renovation.  If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you.  Time is of the essence for the Improvement Obligation.  We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2    **Improvement Plans.**  You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.  Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements.  We will not be liable to you or your lenders, contractors, employees, guests or others on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material modifications to or variations from the Approved Plans require our prior written approval.  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3    **Opening.**  You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation.

3.4    **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards.  You will not operate a Food and Beverage service without our prior written consent, except for a complimentary coffee service/continental breakfast in accordance with System Standards.  If you do not manage the Chain Facility personally, you must employ a full-time general manager who will be dedicated solely to the Facility.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards.  The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual.  You may add to or discontinue the amenities, services and facilities described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay.  Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared

SUPEXC1
I66087  8/04

with or used by guests of . . . 'er lodging or housing facility.

3.5    **Training.**  If this is your first System franchise, you or one of your principal owners will attend an orientation program as described in Section 4.1. The Facility's initial and any replacement general manager must complete to our satisfaction the manager training program described in Section 4.1, even if you employ other managers for other Chain Facilities who have already received such training. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, tuition, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6    **Marketing.**

3.6.1    You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.2    The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7    **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.8    **Financial Books & Records; Audits.**

3.8.1    The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge

3

that your accurate accou... ...for and reporting of Gross Room R... ...es is a material obligation you accept under this Agreement.

3.8.2  We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9  **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement.  You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10  **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Super 8 Motels, Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors

4

and assigns as additional needs.

3.11    **Conferences.** Chain conferences are held on either a chain-wide or regional basis. You or your representative must attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we determine to hold a Chain Conference. If you operate other lodging facilities under the System in addition to the Facility, you must send a different representative to the Chain conference and pay another Conference Fee for each facility. We will charge you and you must pay the Conference Fee even if you do not attend the Chain conference. You will receive reasonable notice of a Chain conference.

3.12    **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13    **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Super 8 Motels" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will refer any guest that the Facility cannot accommodate to the nearest Chain Facility unless and until the guest expresses a preference for a different lodging facility. You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.

3.14    **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility over 120 rooms. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15    **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

4.    **Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1    **Training.** We will offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1    **General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction before

the Opening Date. If we don't offer a place in general manager orientation within that time frame, your general manager must attend the next program held at which we offer a place. Any replacement general manager must complete general manager orientation within 90 days after he/she assumes the position or the next program available, whichever comes later. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition of $995 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the time period established under this Agreement. You must pay the tuition then in effect as disclosed in our latest Uniform Franchise Offering Circular ("UFOC"), but not more than $3,000, if you do not meet these deadlines. For any supplemental or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

**4.1.2 Owner Orientation Training.**    We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.  If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably before, but not later than 90 days after the Opening Date. If we do not offer owner orientation training within this time period, you must attend the next program offered. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. Owner orientation will be no longer than five days. We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement. If you do not open the Facility and attend orientation by such deadlines, you must pay the tuition then in effect for this program as disclosed in our latest UFOC, but not more than $3,000. You must also pay your travel, lodging, meal and incidental expenses.

**4.1.3 On-Site Opening Training.** We will provide at the Facility or another agreed location, and your staff must attend, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. There is currently no charge for the initial training program. You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need. You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

**4.1.4 Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers. As of March 31, 2003, tuition for remedial on-site training is $450 per day, which must be paid before the training commences. We may increase the tuition charge in the future. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

**4.1.5 Supplemental Training.**    We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be held in our U.S. training center or other locations.  You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. This training may be held in conjunction with a Chain Lodging conference. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

6

4.1.6 **Cancellation Fees.** We will charge you a cancellation fee of 50% of the tuition for a program if you cancel your participation less than 15 days before it is scheduled to be held. If you fail to attend a training program as scheduled without notifying us in advance, your cancellation fee will be 100% of the tuition for the program. These fees are non-refundable and you will also be charged the full tuition in effect for the program when you reschedule your training.

4.2    **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use System Assessment Fees as specified in Schedule C, allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer to or accept from callers to our general consumer, toll-free telephone number in the United States reservations for any lodging facilities other than Chain Facilities. We may use funds in the Advertising and Reservation Fund to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

4.3    **Marketing**

4.3.1    We will use System Assessment Fees, allocated in our discretion from the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of System publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities. We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

4.3.2    We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3    We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for separate fees in addition to the System Assessment Fee, for any resulting group booking accepted at the Facility.

4.3.4    We will publish the Chain Directory. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We may assess a reasonable charge for the direct and indirect expenses (including overhead) of producing

and delivering the Director...

4.4    **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5    **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6    **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on matters of Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7    **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

4.8    **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5.    **Term.** The Term begins on the Effective Date and expires at the end of the twentieth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.    **Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of **$12,000.00**, when you sign this Agreement, which is fully earned when we sign this Agreement, and **$12,000.00** Prom Note due 30 days after the date of execution.

7.    **Recurring Fees, Taxes and Interest.**

7.1    You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may

8

DV
VK
TOTAL P.04

INITIAL
HERE

SUPEXCI
166087 8/04
06125

without billing or demand    ;curring Fees include the following:

7.1.1   A "Royalty" equal to five percent (5%) of Gross Room Sales of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2   A "System Assessment Fee" as stated in Schedule C to be paid into the Advertising and Reservation Fund, accrues from the Opening Date until the end of the Term, including during suspension periods.  Upon 60 days written notice, we may change the System Assessment Fee after the tenth anniversary of the Effective Date to cover costs as described in Schedule C.  You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as travel and other sales agent commissions paid for certain reservations at the Facility plus a reasonable service charge, a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet, or other reservation systems and networks, and fees for additional services and programs.  We may increase or adjust the Additional Fees to cover the cost of the services or to add new services or programs at any time on not less than 60 days prior written notice.

7.2     "Taxes" are equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State.  You will pay Taxes directly to us when due.

7.3     "Interest" is payable on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.  Interest is payable when you receive our invoice.

7.4     If a Transfer occurs, your transferee or you will pay us a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

## 8.    Indemnifications.

8.1     Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated with or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven.  You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury.  This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2     You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee.  You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion,

SUPEXC1
166087  8/04

because of actual or poter     conflicts of interest. We must appro     ny resolution or course of action in a matter that could directly or indirectly have any effect on parties other than you and the complaining party in the matter, or could serve as a precedent for other matters.

8.3     We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after we receive the transferee's Application. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in, the alternative, condition our

SUPEXC1
166087 8/04

approval of the Transfer o    e or more of the following: limit the t    feree's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10.    Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11.    Default and Termination.**

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8 you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate

11

this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed, or, in the case of quality assurance default, you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection to cure the default within 90 days after the inspection. We may terminate this Agreement if you do not perform that improvement agreement.

11.2    **Termination.**  We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Super 8 Motel", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you or any of your Equity Interest owners contest in court the ownership or right to license or franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3    **Casualty and Condemnation.**

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate the License, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If the License so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3  The exclusive territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4    **Our Other Remedies.**  If you violate your covenant in Section 2, we may reduce the Protected Territory to the Location. We may suspend the Facility from the Reservation System for

any default or failure to p    r perform under this Agreement or an     er written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Reservation System User Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. If needed, our consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5    **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.    <u>Liquidated Damages.</u>

12.1    **Generally.** If we terminate the License or this Agreement under Section 11.2, or you terminate the License or this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 36 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less. If the Facility has been open for fewer than 36 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 36. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement are not affected.

12.2    **Condemnation Payments.** If a Condemnation occurs, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2 or until the Condemnation occurs, whichever is longer. If the Condemnation is completed before the one year notice period expires, you will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is

13

completed after the one ye.... notice period expires you will pay no Li.... ...ated Damages, but the fees set forth in Section 7 must .. paid when due until Condemnation is co....leted.

**12.3   Exclusions.**  The amount of System Assessment Fees used in the computation of Liquidated Damages shall exclude travel agent commissions, airline reservation system charges and related handling charges.

**13.    Your Duties At and After Termination.**  When this Agreement terminates for any reason whatsoever:

**13.1   System Usage Ceases.**  You will immediately stop using the System to operate and identify the Facility.  You will remove all signage bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility.  You will promptly paint over or remove distinctive System trade dress, color schemes and architectural features.  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces.  You will cease all Internet marketing using any Marks to identify the Facility.

**13.2   Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination.  You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8 Motel", including the System Assessment Fees for so long as the Facility receives service from the Reservation System.  We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4.  We may notify third parties that the Facility is no longer associated with the Chain.  We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination.  You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage.  We will exercise reasonable care in removing or painting over signage.  We will have no obligation or liability to restore the Facility to its condition prior to removing the signage.  We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

**13.3   Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

**13.4   Survival of Certain Provisions.**  Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.    Your Representations and Warranties.**  The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement.  You expressly represent and warrant to us as follows:

**14.1   Quiet Enjoyment and Financing.**   You own, or will own prior to commencing improvement, or lease, the Location and the Facility.  You will be entitled to possession of the

Location and the Facility during the entire Term without restrictions would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2    **This Transaction.**    You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3    **No Misrepresentations or Implied Covenants.**    All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15.    Proprietary Rights.

15.1    **Marks and System.**    You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2    **Inurements.**    All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3    **Other Locations and Systems.**    We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary

rights, (ii) other lodging, ⸱⸱⸱d and beverage facilities, or business ⸱⸱nder the System utilizing modified System Standar⸱⸱, and (iii) a Chain Facility at for any l⸱⸱ation outside the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16

**16.**    **Relationship of Parties.**

16.1    **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2    **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

**17. Legal Matters.**

17.1    **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2    **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3    **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

SUPEXC1
166087  8/04

Super 8 Motels, Inc.:
Our address:  1 Sylvan Way, P.O.  Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration
Fax No.  (973) 496-5359

Your name: **AMERICAN LODGING PARTNERS, INC.,**
Your address: **155 N. Harbor Drive, Unit 3407 Chicago, IL 60601,**
Attention: **Vivak Khanna;**
Your fax No.:

17.4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

17.6  **Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc.  We will provide you with the contact address for that organization.  The mediation will be conducted by a mutually acceptable and neutral third party.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4  **WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.7  **Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

17.7.1  **You received our Uniform Franchise Offering Circular ("UFOC") for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

18

**17.7.2**   Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

**17.7.3**   This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

**17.7.4**   You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

**17.7.5**   You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

SUPEXC1
166087  8/04

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
Super 8 Motels, Inc.

By: _____          Attest: _____
    (Vice President)                            Assistant Secretary


**YOU**, as Franchisee:
**AMERICAN LODGING PARTNERS, INC.**

By: _____          Attest: _____
    **(Vice) President**

SUPEXC1
166087  8/04

**APPENDIX A**

DEFINITIONS

Advertising and Reservation Fund or "the Fund" means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid. The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain

21

Facilities, and at our discretion, other Super 8 Motels and Super Suite facilities located outside the United States, Canada and Mexico.

Effective Date means the date that you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

SUPEXCI
166087  8/04

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **12808 S. Ashland Ave, Calumet Park, IL**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

SUPEXC1
166087 8/04

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Protected Territory means **the area within a circle created by a three (3) mile radius whose centerpoint is the front door of the Facility.**.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the aggregate of all fees charged under Section 7.1.2 to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Super 8 Motels, Inc., a South Dakota corporation, its successors and assigns.

SUPEXC1
I66087 8/04

# SCHEDULE A

(Legal Description of Facility)

SUPEXC1
166087  8/04

# LEGAL DESCRIPTION
## 12808 S. ASHLAND AVE.
## CALUMET PARK, IL

The South ½ of the North ½ and the South 21 feet of the North ½ of the North ½ of the Southeast 1/4 of the Northeast 1/4 of the Northeast 1/4 of Section 31, Township 37 North, Range 14 East of the Third Principal Meridian (also known as the South ½ of the North ½ and the South 21 feet of the North ½ of the North ½ of Lot 4 in Heckler's Subdivision of the Northeast 1/4 of the Northeast 1/4 of Section 31, Township 37 North, Range 14 East of the Third Principal Meridian), except that part of the North ½ of the Southeast 1/4 of the Northeast 1/4 of the Northeast 1/4 of Section 31, Township 37 North, Range 14 East of the Third Principal Meridian which was acquired by the Cook County Highway Department by Deed Recorded July 14, 1965 as Document No. 19526523, in Cook County, Illinois

Permanent Index Number: 25-31-204-028-0000

## SCHEDULE B

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|----------------------|-------------------------|
| Vivak Khanna | 33.33% | Common Stock |
| Dharam Vir | 33.33% | Common Stock |
| Desh P. Mehta | 33.33% | Common Stock |

PART II:       THE FACILITY:

   Primary designation of Facility: Super 8 Motel

   Number of approved guest rooms: **93**.

   Parking facilities (number of spaces, description): **93**.

   Other amenities and facilities:

PART III:      DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
               COMPLETED AS THE IMPROVEMENT OBLIGATION:

               **[Punch List to be attached.]**

SUPEXC1
166087  8/04



# FRANCHISOR: SUPER 8 MOTELS, INC.

## "SCHEDULE B PART III"
## PUNCHLIST FOR CHANGE OF OWNERSHIP
## DECEMBER 20, 2004

**FACILITY**
Super 8 Motel #08592
12808 South Ashland Avenue
Calumet Park, IL  60827

**TIER**
Motel

**GUESTROOMS**
93

**OWNER/APPLICANT**
Vivak Khanna
(312) 479-2186

**FRANCHISE RETENTION**
Ted Anka
(312) 925-2738

**O.A. REPRESENTATIVE**
Terry Howell

## PROPERTY CONDITION SUMMARY

This 8-year-old, 3-story, rectangular-shaped, interior corridor building is constructed of a wood frame with a stucco facade. Some building exterior, public area and guestroom/bath area renovations will be required. Seasonal upgrading will be required to enhance curb appeal.

There are twelve guestrooms equipped with Jacuzzi tubs and twenty guestrooms equipped with refrigerators and microwaves.

This property is located off of I-57 (exit #353) in the Southern suburbs of Chicago, IL approximately twelve miles from the downtown business district of Chicago. Clientele consists of highway traffic/transients, long-term stay guests and families. Competition includes Best Western and Plaza Inn.



2

Super 8 Motel #08592
Calumet Park, IL

|  | **EXISTING** | **STANDARD** |
|---|---|---|
| Lobby Dimensions: | 558 SF | 400 SF |
| Guestroom Dimensions: | 300 SF (81) | 288 SF |
|  | 500 SF (12) |  |

## *COMPLETION TIME*

**All items listed in this punchlist must be completed within the noted time frames.**

**This Punchlist may contain approved time extensions granted for the purpose of completing specific upgrades or projects required for compliance with the Rules of Operation and Design Manual for Super 8 Motels, Inc. Failure to comply with time extension deadlines may result in immediate reservation restriction and default under your franchise agreement.**

3

Super 8 Motel #08592
Calumet Park, IL

*All Super 8 Motels are required to be in compliance with all items outlined in the Rules of Operation and Design Manual. Following is a partial, but by no means complete, listing. Immediate compliance is required unless otherwise noted within the body of the punchlist:*

- All new General Managers are required to complete management training. It is strongly recommended that this take place prior to opening as a Super 8 Motel, but in no event may it be postponed any longer than 90 days after the opening date.
- All first time Super 8 Motel franchisees are required to attend an orientation program.
- Property manager is required to be TripRewards certified and property must fully comply with all TripRewards requirements.
- Super 8 Motel exterior signage per System Standards.
- Dumpster enclosure to conceal from guests' view is required.
- Landscape upgrades that are professionally designed and executed and approved in advance by the franchisor.
- A SUPER 8 MOTEL showcase in lobby area
- Each Super 8 Motel is required to provide at a minimum, a complimentary continental breakfast per Company specifications.
- A portable phone at the front desk for manager's use.
- A gas detection system must be installed in each area where gas appliances exist in the property.
- Facilities to assist the handicapped in accordance with Local, State and Federal codes, regulations and ordinances.
- Stairwell(s) and corridor(s) must be equipped with emergency and exit lighting with a backup power source.
- Super 8 Motels, Inc. does not allow restaurant or lounge facilities. Restaurant/lounge space must be renovated for alternative use.
- A Company approved Property Management System (PMS) is required.
- Electronic locks meeting Company specifications are to be installed all guestroom entrance doors.
- Hardwired smoke detectors with a backup system are required. This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage.
- A safety guard lock (loop bar or chain) or other non-keyed locking device is required.
- Install a self-closing device on all interior guestroom entrance doors.
- A one-way viewer in all guestroom entrance doors.
- A one way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock on all connecting room doors. Operating knobs must be located on room side only with flush plates on inside of doors.
- A minimum of one glass front, framed picture per headboard, two in a King bedded room is required. Minimum size required is 20" x 16".
- Minimum 25", remote control televisions are required.

4

Super 8 Motel #08592
Calumet Park, IL

*All Super 8 Motels are required to be in compliance with all items outlined in the Rules of Operation and Design Manual. Following is a partial, but by no means complete, listing. Immediate compliance is required unless otherwise noted within the body of the punchlist (continued):*

- A solid wood or upholstered (vinyl not acceptable) luggage bench or wood or metal folding luggage rack is required.
- A GFCI (Ground Fault Circuit Interrupter) outlet in vanity areas.
- A minimum of 60% of guestrooms must be prepared and designated as non-smoking rooms.
- Company requires that all properties maintain housekeeping at the highest levels.

## IMMEDIATE COMPLIANCE

All Super 8 motels are required to provide either SuperStart® or SuperStart® PLUS breakfast service. The breakfast must be presented using quality foods, utensils and display equipment in a tasteful and sanitary manner as specified throughout this section. State and local health codes as well as ease of accessibility (ADA) must prevail at all times. All breakfast items must be provided with no charge to the guest.

### Requirements

1. The selected breakfast option must be complimentary for each registered Super 8 Motel guest.

2. The selected breakfast option must be available for a minimum of 3 consecutive hours between the hours of 6 a.m. and 10 a.m., seven days a week, 365 days per year.

3. Serving hours should be increased to meet occupancy demands.

4. Serving hours must be posted in the breakfast area.

5. The individual Super 8 Motel operator must ensure compliance with local health and sanitation requirements.

6. Breakfast quantities must be sufficient based on the previous night's occupancy. Sufficient staff must be available to ensure proper replenishment and guest satisfaction.

5

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

7. Each breakfast selection must be presented in an attractive, clean, professional, appetizing and neat manner.

8. The Super 8 Motel operator is required to list the selected breakfast option as part of the property listing in the Super 8 International Directory. If the operator does not select the breakfast option, the Company will select the SuperStart® breakfast offering requirement. Changes to the breakfast tier offered may not be made between directory cycles.

9. An area should be set-aside in the lobby, properly furnished, for the breakfast offering. An adjacent hospitality/breakfast area is recommended.

10. Any deviation from the breakfast standard must be approved in writing by the Company.



## *SuperStart®*

A. Breakfast Requirements:

   1. Coffee Requirements:
- Fresh brewed regular coffee; and
- Fresh brewed decaffeinated coffee

   2. Juice Requirements:
- 100% orange juice – individual 6.75 oz containers, machine dispenser or pitcher with ice tube permitted

   3. Tea Requirements:
- Tea bags, regular and decaffeinated
- Hot water

   4. Beverage Options Available in Addition to Coffee, Tea and Juice
- Hot Chocolate – individual packets
- Apple juice may be provided in addition to orange juice, individual 6.75 oz containers, machine dispenser or pitcher with ice tube permitted'
- Milk – individual ½ pint or pint containers of 2%, whole and/or premixed chocolate milk

6

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

5. Beverage Condiment / Supply Requirements:
- Creamers: portion controlled half & half creamers and a portion controlled non-dairy creamer. Shelf stable half & half is acceptable. Flavored creamers in addition to regular creamers are acceptable.
- Sugar – individual packets
- Sugar substitute – individual packets; examples includes Sweet & Low®, Equal®, Splenda® etc.
- Stir sticks – wooden or plastic; spoons are an acceptable alternative
- Napkins – individual, minimum cocktail size (4" minimum)
- Coffee cups – minimum 8 oz disposable. Coffee cups may be used for dispensed juice. Disposable juice cups, minimum 4 oz capacity, wax, plastic or foam, are an acceptable addition to the coffee cup.
- Coffee cup lids

Note, both regular and decaffeinated coffee standing in excess of one hour must be provided in airpots, otherwise brewed fresh regularly. Additionally, instant coffee, coffee bags and/or liquid coffee concentrate are not permitted.

B. Food Requirements:

1. One of the following two options (a) or (b), both may not be provided:
    a. Two types of Breakfast Bars: examples include Kellogg's® Nutri-grain® Bars, Kellogg's® Special K® Bars, Kellogg's® Pop-Tarts® etc.; or
    b. Two Baked Goods to be chosen from:
        1. One non-sweet – Bagels, English Muffins, or Corn or Bran Muffins to be served with:
            - Butter or margarine, portion controlled (PC), individually wrapped; and,
            - Two breakfast spreads, jam or jelly and cream cheese (if bagel option chosen), individual servings
        2. One sweet – Danish, Blueberry Muffins, Sweet Rolls or Donuts
        3. Minimum 5", round disposable plates and disposable knives required with this option.

2. Food Options Available in Addition to Above:
- Peanut Butter – individual serving packets
- Honey – individual serving packets
- Yogurt – low or fat free is recommended

7

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

C.    Equipment Requirements:

1.    SuperStart® wall sign

2.    Beverages:
   a.    Coffee and Tea must be provided in one of three ways:
      1.    Airpots – 4 total: two regular, one decaf and one hot water in an airpot rack with appropriate tags to identify contents.
      2.    Minimum three burner coffee machine, with or without plumbing, UL approved with auto-shutoff feature. Minimum of three pots, one pot for regular, one pot for decaf and one pot for hot water
      3.    Fresh brewed, single serve machine with regular, decaf and hot water options.
   b.    Juice must be provided in one of four ways:
      1.    One or two valve juice dispenser, depending on number of juices provided
      2.    Carafes – to pour dispensed product where dispenser is installed in back of house
      3.    Tabletop chiller – for juice boxes or carafes. Chiller may be black insulated 26" x 18" x 6" ice pan, 19 ½ " diameter white or black round plastic tub 8 ½" high; or 19" diameter aluminum display tub with silver wire stand.
      4.    Pitcher with ice tube, 3.3 liter with smooth sides for juice if dispenser, carafes or individual containers not used
      5.    Tea bags must be provided in 3" x 6" x 2" silver basket.
      6.    Milk, ½ pint or pint option, must be provided in tabletop chiller and may share juice chiller. Chiller may be black insulated 26" x 18" x 6" ice pan, 19 ½ " diameter white or black round plastic tub 8 ½" high; or 19" diameter aluminum display tub with silver wire stand.

3.    Foods:
   a.    Medium 3-tier silver basket for Breakfast Bar option
   b.    3 –tier 6"L x 8"D x 24-1/2"H silver wire basket display with 3 glass ½ gallon Hex canisters 5" diameter x 8-1/8"H with metal covers for sugards, stirrers, creamers, etc.
   c.    One 2-tier silver 12" round display with two plates and two dome covers for baked goods option
   d.    Clear 9" long tongs for baked goods option unless prohibited by local codes, at which time wax paper tissues must be provided

8

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

  e.   2-tier silver platter display with 12" round clear acrylic discs for hand held fruit if provided

  f.   Disposable trays, not paper or cardboard, optional

  g.   One commercial grade bagel slicer, such as Bagel Biter™, optional

D.   Other:

  a.   Coordinated trash receptacle with lid required

  b.   Disposable rubber or latex gloves required



## SuperStart® PLUS

A.   Beverage Requirements:

  1.   Coffee Requirements:
- Fresh brewed regular coffee; and,
- Fresh brewed decaffeinated coffee

  2.   Juice Requirements:
- 100% orange juice – individual 6.75 oz containers, machine dispenser or pitcher with ice tube permitted; and,
- Apple juice - individual 6.75 oz containers, dispenser type or pitcher with ice tube permitted

  3.   Tea Requirements:
- Tea bags, regular and decaffeinated
- Hot water

  4.   Milk Requirements:
- Minimum 2% Milk; or,
- Whole and skim milk are both required if used in place of 2% milk
- Individual ½ pint or pint containers or large volume containers where milk is machine dispensed or served in a pitcher with ice tube

  5.   Beverage Options Available in Addition to Coffee, Tea, Juice and Milk:
- Hot Chocolate – individual packets
- One additional fruit juice, such as pineapple, cranberry, grape, etc., in individual 6.75oz containers, dispenser or pitcher with ice tube

9

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

- Premixed chocolate milk, in individual ½ pint or pint containers or large volume containers where milk is machine dispensed or served in a pitcher with ice tube

6. Beverage Condiment / Supply Requirements:
   - Creamers: portion controlled half & half creamers and a portion controlled non-dairy creamer. Shelf stable half and half is acceptable. Flavored creamers in addition to regular creamers are acceptable.
   - Sugar - individual packets
   - Sugar substitute – individual packets; examples includes Sweet & Low®, Equal®, Splenda® etc.
   - Stir sticks - wooden or plastic; spoons are an acceptable alternative
   - Napkins – individual, minimum cocktail size (4" square)
   - Disposable coffee cups - minimum 8 oz. Coffee cups may be used for dispensed juice. Disposable juice cups, minimum 4 oz capacity, wax, plastic or foam, are an acceptable addition to the coffee cup.
   - Coffee cup lids

   Note, both regular and decaffeinated coffee standing in excess of one hour must be provided in airpots, otherwise brewed fresh regularly. Additionally, instant coffee, coffee bags and/or liquid coffee concentrate are not permitted.

B. Food Requirements:

1. Ready-to-eat hot and cold cereals required:
   a. Instant oatmeal, such as Quaker® Instant Oatmeal
   b. Assorted cereal bowl packs or a minimum of 2 types of nationally recognized branded bulk cereal to be chosen from:
      - 1 Adult Type – Examples include Kellogg's Raisin Bran®, Kellogg's Special K®
      - 1 Kids Type – Examples include Kellogg's Frosted Flakes® or Kellogg's Fruit Loops®
      - Minimum 6-inch, round disposable bowls (if bowl packs not used) and disposable soup spoons

2. Two baked goods required and to be chosen from:
   a. One non-sweet – White and Wheat Bread, Bagel or English Muffin with
      - Butter or margarine, portion controlled (PC), individually wrapped
      - 2 Breakfast spreads, jam or jelly and cream cheese (if bagel option chosen), individual servings

10

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

b.    One sweet – Danish, Blueberry Muffins, Sweet Rolls or Donuts
c.    Minimum 5", round disposable plates and disposable knives

3.    Two seasonal, hand held fresh fruits, such as bananas, apples, oranges, grapes, peaches, pears, etc. required.

4.    Food Options Available in addition to Above:
a.    Peanut Butter – individual serving packets
b.    Honey – individual serving packets
c.    Yogurt – low or fat free is recommended

C.    Equipment Requirements:

1.    SuperStart® PLUS wall sign

2.    Eating and Serving Utensils:
a.    Disposable forks, soup spoons and knives
b.    Two 9" long clear tongs unless prohibited by local codes, at which time wax paper tissues must be provided

3.    Beverages:
a.    Coffee must be provided in one of three ways:
1.    Airpots – 4 total: two regular, one decaf and one hot water in an airpot rack with magnetic tags to identify contents.
2.    Minimum three burner coffee machine, with or without plumbing, UL approved with auto-shutoff feature. Minimum of three pots, one pot for regular, one pot for decaf and one pot for hot water
3.    Fresh brewed, single serve machine with regular, decaf and tea options.
b.    Juice must be provided in one of four ways:
1.    Two-valve juice dispenser
2.    Carafes – to pour dispensed product where dispenser is installed in back of house
3.    Tabletop chiller – for juice boxes or carafes. Chiller may be black insulated 26" x 18" x 6" ice pan, 19 ½" diameter white or black round plastic tub 8 ½" high; or 19" diameter aluminum display tub with silver wire stand
4.    Pitcher with ice tube, 3.3 liter with smooth sides for juice dispenser, carafes or individual containers not used

11

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

    c.    Milk must be provided in one of two ways:

        1.    Tabletop chiller – for individual milk cartons. Chiller may be black insulated 26" x 18" x 6" ice pan, 19 ½" diameter white or black round plastic tub 8 ½" high; 16 ½" diameter x 10" high insulated granite icer; or 19" diameter aluminum display tub with silver wire stand. The same chiller may be used for both juice boxes and milk cartons

        2.    Dispenser machine for large volume containers or pitcher with ice tube, 3.3 liter with smooth sides

    d.    Tea bags must be provided in a 3" x 6" x 2" silver basket

4.    Foods:

    a.    2-tier silver platter display with 12" round clear acrylic discs for fruit items

    b.    3-tier 6"L x 8"D x 24-1/2"H silver wire basket display with 3 glass ½ gallon Hex canisters 5" diameter x 8-1/8"H with metal covers for sugars, stirrers, creamers, etc.

    c.    Two 6-1/2"L x 6-1/2W x 5"H silver storage basket for jelly and cream cheese

    d.    Two 4.5" diameter silver utensil holders

    e.    Two 6" x 6" x 2" silver baskets for napkins

    f.    White cold crock dispenser set, 7-1/4" diameter x 7-1/4"H for butter/margarine, cream cheese and diary creamers

    g.    One 6"H clear frosted riser for elevating one of the baked goods display

    h.    Two white oval 14" x 18: x 3" platters for baked goods

    i.    Two clear oval dome platter cover with hinges door, size 14" x 18" for baked goods platter

    j.    Two 9" long clear tongs unless prohibited by local codes, at which time wax paper tissues must be provided

    k.    Toaster – commercial with minimum 2 wide slots

    l.    2-tier 15 ¾" x 13 ½" x 17" silver display rack for cereal bowl packs or bulk dispenser for bulk cereals

    m.    One commercial grade bagel slicer, such as Bagel Biter™, optional

    n.    Disposable trays, not paper or cardboard, optional

5.    Other:

    a.    One 31" Apply Spray for cereal rack decoration or other Company approved decor

    b.    One 36" sunflower swag for decoration in front of baked goods or other Company approved décor

    c.    Coordinated trash receptacle with lid

12

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

     d.    Disposable rubber or latex gloves

### Breakfast Offering Upgrades

In addition to the items listed above, each property may provide **one** additional food item as necessary to meet local marketing needs. The following options are available:

1. The SuperStart® breakfast tier may provide a toast bar to include white, wheat and rye breads, toaster and additional condiments in individual serving containers; or,

2. Either SuperStart® or SuperStart®Plus may provide a fresh baked or frozen waffle option with appropriate equipment and condiments in individual serving containers; or,

3. The SuperStart® PLUS tier may provide microwaveable breakfast sandwiches, such as egg, cheese & bacon, egg, cheese & sausage, etc. A commercial microwave is required with this option; or,

4. Any other option/addition must receive prior written approval from the Company before being provided by the motel.

### Furniture and Fixture Requirements

1. Counter size for the SuperStart® tier to be 5 ft long, 24" deep (30" depth recommended)

2. Counter size for the SuperStart® PLUS tier to be 10 ft long, 24" deep (30" depth recommended)

3. Seating is required. Café type tables and chairs recommended; banquet or "stacking" type chairs are not permitted. If café chairs are not used, seating must have upholstered seats and backs. Vinyl permitted for breakfast area chairs only. Plastic furniture is not acceptable. Banquet tables are not permitted.

4. If the breakfast area is not a separate room and the area must be provided in a lobby with restricted space, the property must provide the breakfast in a decorated area matching lobby decor and furnishings. Noise levels in the breakfast area should be addressed through the use of dividers, plants and/or doors if possible.

5. Super 8 recommends that the breakfast area be located in a separate breakfast/hospitality area or room near the lobby. If a separate area is used, the area should meet the following requirements:

     -    Lighting should be controlled in order to produce varied effects at different times of the day (dimmer switches and window coverings are recommended methods).

13

Super 8 Motel #08592
Calumet Park, IL

## IMMEDIATE COMPLIANCE CONTINUED

- The furnishing, fixtures and equipment must be color coordinated and of subtle tones. Legal Requirements must be observed at all times. The buffet area must be permanent fixture, finished with a solid surface, Formica or tile top and under-the-counter cabinets.
- Seating area should meet occupancy demands at maximum periods. A minimum of seating equal to 1/4 (one fourth) of the total number of guestrooms not to exceed seating for 35, unless market dictated, is required. This requirement must be met upon license transfer of ownership or license renewal for existing properties, however less seating may be acceptable with prior company approval. Seating must be accessible to persons with disabilities, including persons who use wheelchairs. Please refer to the property's local building code requirements.
- The decor must be coordinated and pleasing to the eye. The breakfast room/hospitality area should include a minimum of one 25" color television with closed captioning operation. A nationally recognized newspaper, such as USA Today® is recommended to be provided. Silk flowers, wall hangings, wall décor and/or live plants should be utilized to create a relaxing atmosphere.

## In addition, the following renovations are required for this site:

## TO BE COMPLETED WITHIN 30 DAYS OF THE NEW LICENSE AGREEMENT

## PUBLIC AREAS:

Upgrade corridors and stairwells to include the following:

a.   Provide a breaker bar for each fire extinguisher cabinet where missing (i.e. by guestrooms #106 and #315).
b.   Replace inoperable emergency exit light by guestroom #128.
c.   Replace inoperable stairwell lights (i.e. by guestroom #233).

14

Super 8 Motel #08592
Calumet Park, IL

## TO BE COMPLETED WITHIN 30 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED

### GUESTROOMS/BATHS:

Each whirlpool/Jacuzzi must be equipped with a 15-minute timer at a convenient location, but outside the reach of anyone in the spa, to control the operating time.

### OPERATIONAL REQUIREMENTS:

1.    Company requires that all properties maintain housekeeping at the highest levels.

2.    Ensure property is in compliance with all items outlined in the Rules of Operation and Design Manual for Super 8 Motels, Inc. to include but not be limited to current market collateral, staff uniforms, guest convenience and amenity items, guestroom amenities and supplies and so on.

## TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT

### PROPERTY SIGNAGE:

Upgrade property signage to provide approved graphics.  Signage must be purchased from a vendor approved in advance by the franchisor.  Contact Barb Michlitsch at (605) 229-8060 or the Brand Identity Department at (973) 496-5224 for assistance with the following sign issues:
a.    Paint high-rise sign stanchion.
b.    Eliminate "Cal Park" banner. Banners are not acceptable.
c.    Replace inoperable reader board with an approved reader board (i.e. either electronic or static). Reader board is required to be in proportion to the primary sign.

### PROPERTY EXTERIOR:

1.    Upgrade building exterior to include the following:
a.    Repair cracked stucco areas of building façade.  In addition, pressure wash/chemically clean stucco to eliminate stains (i.e. under PTAC units).
b.    Replace window screens where worn/damaged.  Provide screens where missing.

15

Super 8 Motel #08592
Calumet Park, IL

### TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED

2.   Reseal and stripe parking lot.

3.   Seasonal upgrading to property landscaping will be required to maximize curb appeal. Provide additional ground cover to eliminate bare/scarce areas along building, signage and lobby entrance areas.

## PUBLIC AREAS:

1.   Upgrade public areas (i.e. lobby, breakfast/meeting room, public restroom, stairwells and corridors to include the following:
    a.   Replace carpet in lobby, breakfast/meeting room and corridors. Professionally clean stairwell carpet to eliminate stains. If stains remain, replacement is required. Company requires cut pile carpet or level loop with padding. Carpet must be designed for commercial traffic.
    b.   Replace table used for coffee service with a built-in unit.
    c.   Ensure no banquet tables are used for service of the continental breakfast.
    d.   Replace corridor wallcovering where damaged (i.e. 2nd floor ice/vending area). Company requires 12 ounce vinyl wall covering or an approved textured finish.
    e.   Regrout ceramic tile flooring at elevator entrance areas.
    f.   Paint/clean stairwell and guestroom entrance doors and frames to eliminate scuffs.
    g.   Install window blinds in corridors and stairwells where missing (i.e. by guestroom #333).
    h.   Provide a sink stopper in public restroom.

2.   Replace flooring in all ice/vending and guest laundry areas. Company requires flooring designed for commercial traffic.

## GUESTROOMS/BATHS: (Rooms Viewed: #103, 105, 110, 116, 121, 126, 127, 211, 212, 233, 327 and 333.

1.   Upgrade guestrooms to include the following:
    a.   Replace carpet throughout. Minimum 26-ounce, cut pile carpet with padding is required. Carpet must also be wall to wall.
    b.   Replace wallcovering to include bath areas where damaged and/or seams are visible as in rooms #103, #105 and #126. Company requires either 12-ounce vinyl wallcovering or an approved textured finish.

16

Super 8 Motel #08592
Calumet Park, IL

    c.   Replace wall-mounted refrigerator/microwave shelves in "small suite rooms" (i.e. room #127) with cabinets.  Replacement of wallcovering in these rooms is also required.  Company requires either 12-ounce vinyl wallcovering or an approved textured finish.

    d.   Refinish casegoods (i.e. tables, nightstands, etc.) to eliminate finish loss and/or burns as in rooms #121, #211 and #212.

    e.   Professionally clean chairs to eliminate stained upholstery as in rooms #126 and #212.

    f.   Upgrade lamp package to include the following.
        1.   Provide lamps where missing as in room #327.
        2.   Replace lamps where tarnished as in room #126.
        3.   Replace inoperable light bulbs (i.e. rooms #121, #211 and #233).
        4.   Replace mismatched and/or worn lampshades as in rooms #116 and #126.
        5.   One lamp per headboard and lighting in the work area, leisure area and credenza area are required.  All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable.  Lamp package must be neutral and contemporary (i.e. brass).  The use of red or other colors of anodized metal is not recommended.  Swag lamps are not acceptable.

    g.   Replace bedspreads where inadequate in size (i.e. rooms #116 and #127).  Each bed must have a quilted bedspread of an appropriate size for the bed.

    h.   Replace draperies.  New drapes must have blackout capabilities and one-way draw with baton operation.

2.   Upgrade bath areas to include:

    a.   Replace vanity mirrors where desilvered as in room #121.  At a minimum 30" x 30" mirrors are required.

    b.   Deep clean, regrout and seal flooring to eliminate discoloration, stains and/or damaged grout.

    c.   Install a non-skid treatment in all Jacuzzi tubs.

    d.   Provide bathtub stoppers where missing as in room #116.

**TO BE COMPLETED WITHIN 180 DAYS OF THE NEW LICENSE**

Replace televisions that have burned cabinets as in room #121.  Minimum 25", remote control televisions are required.

17

Super 8 Motel #08592
Calumet Park, IL

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR.  ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards.  The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations.  You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified.  The owner is responsible for meeting all Franchisor Standards.  All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist.  Note that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor.

**This Punchlist is subject to revision by the Franchise Review Committee and should not be
considered to be final until the License Agreement for the inspected facility is executed by
the Company.**

**NOTE:**  Any item on this Punchlist that is not required to be completed prior to the new license
agreement will continue to be evaluated for appearance and condition during all Quality
Assurance inspections conducted before the date when completion is required.

8592 CO S8
JD/nh



**SUPER 8 MOTELS, INC.**
**SCHEDULE C**
**August 2004**

### System Assessment Fee

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period. Notwithstanding the above, we may increase the System Assessment Fee you pay upon 60 days advance written notice, effective at any time on or after the tenth (10th) anniversary of the Effective Date of this Agreement, as part of a Chain-wide increase in System Assessment Fees we implement in our sole discretion to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs. We may increase System Assessment Fees on a Chain-wide basis before the tenth anniversary of the Effective Date but such Fees will not begin to accrue at the increased rate until the tenth anniversary of the Effective Date.

### Additional Fees

A.     Mandatory Marketing Program Charge

We charge a Mandatory Marketing Program Charge for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Mandatory Marketing Program Charge is up to 5% of the Gross Room Sales accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check-in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

B.     GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility. The GDS Fee described in Section 7 is $4.50 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $3.50 per reservation booked through sources other than GDS powered websites or our Chain website. GDS and Internet-originated reservations may also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

C.    Other Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Sales generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .75% of commissionable revenue. We may raise the agent commission to up to 15% of Gross Room Sales from time to time for certain Chain-wide promotions, plus our service charge of .75% of commissionable revenue, upon 30 days advance written notice. Such increases will apply only to reservations booked after we announce the increased commission unless we specify otherwise. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf. You may elect not to receive reservations from either the GDS or Internet websites, other than the Chain's website, by giving us 60 days advance written notice. We will remove the Facility from participation in both channels. However, you must pay all fees and commissions incurred for reservations booked through the GDS or Internet before deactivation. You may reactivate the Facility's listing through such channels once by paying us a reactivation charge of $100.00, after which you may not deactivate again during the Term of your License. Your participation in the GDS and Internet must be for either both or neither distribution channel.

We also charge you an annual website maintenance fee of $36.00 to maintain the Facility's web pages on the Chain's website. We may charge additional fees for creating or modifying the Facility's web pages or performing other services related to Internet marketing.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may

SUPEXC1
166087 8/04

receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and System Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of certain affinity groups and organizations at your Facility if you participate in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

D.    Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish, we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

We may increase or adjust any of the Additional Fees to cover increases in their allocated costs and may add new fees and charges for new services and programs at any time upon not less than 60 days notice.

SUPEXC1
166087 8/04

```
FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW

JFB
```

# EXHIBIT B

Location: Calumet Park, IL
Site: 8592

## SATELLITE CONNECTIVITY SERVICES ADDENDUM

This Satellite Connectivity Services Addendum (the "Addendum") by and between SUPER MOTELS, INC. ("we," "our," "us") and **AMERICAN LODGING PARTNERS, INC.** ("you," "your") is dated _NOV 30_ , 20_04_ (the "Addendum Effective Date"). This Addendum is part of the Franchise Agreement (the "Agreement") between you and us.

Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall supercede and apply:

1. <u>Services</u>. Our affiliate has entered into an agreement with Hughes Network Systems, Inc. ("HNS") under which we are authorized to provide our franchisees with satellite-based Internet connectivity services. The specific satellite communications services ("Services") and related equipment necessary for the proper functioning of the Services ("Equipment") are listed in Schedule 1 of this Addendum. We will furnish to you the Services and Equipment (collectively, the "VSAT System") for the Facility. Once installed, you will access the Central Reservation System, the Central Data Warehouse, the Email Network and the Brand Information Source (as those terms are defined in the Software and Services Agreement) using only the VSAT System, except in emergencies, while this Addendum remains in effect.

2. <u>Site Inspection</u>. You will reasonably cooperate with us and HNS to determine how the Equipment will be installed. You will furnish us or HNS with any information requested in order to complete the installation. We or HNS, in our sole discretion, will determine the placement of the Equipment at the Facility, which is intended to ensure the optimal performance of the Services.

3. <u>Installation</u>. HNS will install the Equipment at the Facility during regular business hours, when possible. HNS may install, at its sole discretion, anti-icing equipment to protect the Equipment at the Facility at no additional cost to you. If anti-icing equipment is installed, you must provide, at your expense and prior to the installation date, a source of 110V GFCI 20-amp non-dedicated circuit AC power that is readily available at the antenna site. If your installation involves more than two access devices, or additional Equipment, cabling or costs beyond the standard installation package, we may charge you for the charges we incur with HNS to complete installation of the VSAT System, plus an administrative charge of nor more than $50.00. You will allow installation personnel reasonable access to all areas of the Facility necessary to perform the installation. You will obtain in advance, if necessary, any required permits, approvals or consents from any governmental authority, your landlord or mortgagee to install the Equipment at the Facility, including access to the premises of a third-party, if necessary, to complete the installation. You will permit the installation of certain Equipment on the roof or attached to the exterior walls of the Facility. You will furnish to the installation personnel, free of charge, adequate electrical power, local telephone service, water and other utilities necessary to perform the installation. If (a) you postpone a scheduled installation with less than seven (7) days prior written notice to us, or (b) an installation is delayed or aborted

1

because you did not comply with this Section 3 (collectively, a "Cancellation"), you will pay us an Installation Cancellation Charge of $1,000.00 within five (5) days after our written notice to you. If a second Cancellation occurs, you will be in default under this Addendum. You must then cure this default within thirty (30) days after you receive written notice from us. Toll-free access to the Central Reservation System will be unavailable to you while you are in default under this Addendum. We will provide and will reprogram your property management system or property terminal unit to dial a working telephone number for Central Reservation System access, which may cause you to incur toll charges.

4. <u>Operations; Authorizations</u>. (a) Once installed, you will not move the Equipment without our prior written consent. You will maintain the Equipment according to the environmental conditions we specify. Upon reasonable prior notice, you will give us or HNS reasonable access to inspect the Equipment.

(b) You will maintain, at your expense, any necessary permits and licenses required for your use of the VSAT System.

(c) After the Start Date, we will provide through HNS the Services during the Term so long as you are not in default under this Addendum or the Agreement.

5. <u>Support and Maintenance</u>. After the Equipment is installed and Service commences, we will provide you a toll-free number for reporting VSAT System problems. You will contact the number promptly when and if you experience any problems with the VSAT System, or if any casualty affects the VSAT System. We or HNS will work with you to determine if the problem requires support or maintenance services. The support and maintenance services we or HNS will provide you are listed in Schedule 2 to this Addendum. You will allow maintenance personnel reasonable access to all areas of the Facility necessary to perform these services.

6. <u>Monthly Charges</u>. You will pay to us for the VSAT System a Monthly Service Charge of $150.00 for the period (the "Install Period") beginning on the Start Date and ending at the end of 60 full months after the Start Date, or such lesser amount as we determine to charge all similarly situated licensees in our sole discretion for any subsequent period of time and so notify you in writing. The "Start Date" is the date the Equipment has been installed at the Facility and the VSAT System begins operating. Charges will begin to accrue on the Start Date. We will invoice you for the Monthly Service Charge in advance each month. We will charge you a pro-rated amount of the Monthly Service Charge for the portion of a calendar month in which the Start Date occurs if it is not the first day of the month. You will pay the invoice amount to us upon receipt. You will also pay any excise, sales, use or other taxes assessed in connection with the VSAT System. We may apply any amounts received to any outstanding invoices in any order. We may, after we give you at least 30 days advance written notice, increase the Monthly Service Charge during the term of this Addendum by an amount that reflects the actual price increase to us in the rates HNS charges us for the VSAT System and the cost of providing any related support or maintenance services. If we increase your Monthly Service Charge, we will also apply these increases to all other similarly situated Chain Licensees.

7. <u>Term</u>. This Addendum will be effective from the date of execution by you and us and

shall continue in full force and effect for a period (the "Initial Term") ending on the last day of the sixtieth (60th) month, starting on the first day of the month following the Start Date (the Term Start Date"), unless earlier terminated in accordance with the terms of this Addendum or the Agreement. At the end of the Initial Term, this Addendum shall renew (a "Renewal Term") on a quarterly basis until either you or we give written notice of termination to the other party at least ninety (90) days before the end of the Initial Term or any subsequent Renewal Term.

8. Software. (a) We assign to you HNS' non-exclusive licenses to use the operating systems in connection with the VSAT System (the "Software"), subject to the conditions and limitations in this Addendum. The Software licenses are found on the packaging of the Equipment. The Software may be used only in conjunction with the VSAT System at the Facility, at no other location, and for the sole purpose of obtaining the Services in connection with the operation of your franchise with us. You may not disclose, reverse engineer, alter, add to, modify or copy the Software for any reason. You may not, directly or indirectly, distribute, sell, assign, transfer, offer, disclose, lease or license the Software to a third party.

(b) Title to and ownership of the Software shall remain with us or those entities that have authorized us to sublicense and use them, free of any claim or right of yours or the holder of any security interest, lien or encumbrance on the Facility or any of your other property. If any person attempts to establish any legal right in the Software, you will promptly notify us in writing.

9. Title to Equipment; Risk of Loss; Insurance. HNS or its designee retains title to the Equipment. You have no right, title, or interest in the Equipment other than as specified in this Addendum. The Equipment is not intended to be a fixture or permanently attached to any real property. You will not allow any security interest, landlord's lien, or any other lien or encumbrance to be placed on or attach to the Equipment. If any person attempts to establish any legal right in or to the Equipment, you will promptly notify us in writing. We or HNS may, at our option, mark, label or otherwise identify the Equipment. You will not remove or deface such identification. You bear the entire risk of loss, theft, damage or destruction of any installed Equipment from any cause whatsoever, unless we or HNS directly caused the loss, damage or destruction. You will promptly notify us if the Equipment is damaged for any reason. You will maintain "all-risk" fire and extended casualty (including any acts of nature such as lightning, wind, rain, snow, flood, fire and hail) insurance for the Equipment during the Initial Term and any Renewal Term of at least $25,000, and you name us, Cendant Corporation, Cendant Finance Holding Corporation, their successors and assigns as additional insureds. You will furnish us, prior to installation of the VSAT System, with a certificate of insurance showing the insurance coverage is in effect, the named insured and additional insureds. You must furnish us with an updated certificate of insurance each year when renewed and every time a change is made in your insurance policy or insurance carrier.

10. Force Majeure. If performance by you, HNS or us is delayed or prevented because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or telephone transmissions, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay. Delays or failures to pay resulting from lack of funds

3

will not be deemed delays beyond your reasonable control.

11. No Warranties; Security; Indemnity. (a)    WE MAKE NO WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE VSAT SYSTEM, ITS MERCHANTABILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, OR ITS CONFORMANCE TO SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION.

(b)  We do not warrant any connection to or transmission over the VSAT System, other than as specified in this Addendum. Your use of any information obtained through the Services is at your own risk. We deny any responsibility for the accuracy or quality of the information obtained through the Services.  We do not warrant that the VSAT System will be operate uninterrupted or error-free.

(c)  You may not use the VSAT System to take any actions or make any statements that (i) infringe on another party's copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy; (ii) violate any applicable law, statute, ordinance or regulation; (iii) are defamatory, trade libelous or threatening; (iv) are pornographic or obscene; (v) violate any laws regarding unfair competition, discrimination or false advertising; (vi) result in the distribution of viruses, Trojan horses, worms, time bombs, cancelbots, chain letters or other similar harmful or deleterious programming routines; or (vii) result in the unauthorized entry to any other network, machine or device accessible through the Services.   You are responsible for all content transmitted from the VSAT System using the Services.

(d)  You are responsible for user access security for the VSAT System, and any unauthorized use of the VSAT System. You must authorize and supervise the users of the VSAT System.  We may not provide user access security. However, we and HNS will use reasonable efforts to assist you with detecting and identifying a possible security breach.

(e)  We or HNS may, at our sole discretion, institute security controls on the Services to protect the confidentiality, privacy, integrity and availability of your information and our information.  These controls include (i) requiring users to utilize unique identification and authorization; (ii) limiting certain levels of access to persons you authorize; (iii) implementing access controls on all data, software or other file-system objects to limit access to only authorized users; (iv) ensuring the integrity of all data stored or processed; and (v) preventing the loss of data processed or transferred.

(f)  You acknowledge that the VSAT System is specifically authorized for the Facility's commercial use only, and is not intended for personal Internet use by your personnel or Chain guests. We or HNS may, at our sole discretion, institute filters, screens, traps or other devices on the Services and block certain Internet content from being received at or transmitted from the Facility.

(g)  You will indemnify and hold harmless us, our affiliates, successors and assigns and each of the respective directors, officers and employees associated with them against all claims of employees, agents, guests, and all other persons and entities, arising out of your operation, use or

4

non-use of the VSAT System, including any content disseminated from the VSAT System at the Facility. We will not be liable to you or any other person or entity for personal injury, personal loss or property loss, including but not limited to, damage to the Facility, as a result of your operation, use or non-use of the Services and Equipment.

12. <u>Temporary Internet Service</u>. If installation of the VSAT System at the Facility is delayed when your Facility opens as a Chain Facility, you must subscribe, on a temporary basis, to the Internet access service we designate if it offers a local point of presence where the Facility is located. However, in certain locations you may be obligated to pay additional Internet access charges if your usage exceeds certain specified limits. If our designated supplier does not offer service in your area, you must subscribe to another Internet service provider, at your cost, until local Internet access service is available from our designated supplier so you can access our information sources available to franchisees over the Internet. You will be responsible for all charges for local access and long distance telecommunications, except the direct charges of any toll-free service we offer.

13. <u>Default; Termination; Attorney's Fees</u>. (a) If you are in default under Section 11.1 of the Agreement, or any one of the events described in Section 11.2 of the Agreement that gives us the right to terminate occurs, or you violate Section 11(c) of this Addendum, or you violate Section 8 of the Addendum, or you are in default under either Sections 2 or 3 of the Addendum, or the Equipment becomes inoperable by your act or omission, or you assign or transfer, or attempt to assign or transfer the Services or Equipment without our consent, except as permitted under the Agreement, then to the extent permitted by applicable law, we shall have the right to suspend the Service and use of the Equipment, while the default remains uncured. Additionally, if you default under this Addendum and do not cure the default within the time permitted, we may, at our option, terminate only this Addendum and not the Agreement, upon written notice to you.

(b) Upon the termination of this Addendum for any reason, you will permit us or HNS reasonable access to Facility to remove the Equipment. YOU EXPRESSLY WAIVE ANY RIGHT TO NOTICE OF OR A HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY US, HNS OUR OR THEIR AGENTS OR REPRESENTATIVES TO REMOVE THE EQUIPMENT WITHOUT JUDICIAL PROCESS. If you fail or refuse to permit the peaceable entry to take possession of any Equipment, you will be liable for rental of the Equipment at the rate of Five Hundred Dollars ($500.00) per week from the date that we first attempt to retake it.

(c) If we terminate this Addendum under Section 13(a), you will pay us "Addendum Liquidated Damages" of One Thousand Dollars ($1,000.00) within 10 days following the date of termination. Addendum Liquidated Damages are paid in place of our claims for lost future Monthly Service Charges under this Addendum and the costs to de-install the Equipment. You and we acknowledge that actual damages are difficult or impossible to ascertain on the Addendum Effective Date, and the amount of the Addendum Liquidated Damages is a reasonable pre-estimate of the damages that will be incurred and is not a penalty. Our right to receive other amounts due under the Agreement and this Addendum is not affected.

5

(d)    The non-prevailing party will pay the costs and expenses, including reasonable attorneys' fees and the expenses, incurred by the prevailing party to enforce this Addendum.

SUPEXC1
166087  8/04

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE:**
**SUPER 8 MOTELS, INC.**

By: _____
        (Vice) President


**YOU,** as franchisee:
**AMERICAN LODGING PARTNERS, INC.**

By: _____
        (Vice) President

SUPEXCI
166087  8/04

### SCHEDULE 1
### SERVICES AND EQUIPMENT

The Services are full duplex point-to-multipoint satellite communications between an HNS shared hub (the "Hub") and the Facility.  The Services include the following:

1)  Provision and operation of the Hub by HNS on a 24 hour per day, 365 day per year basis.

2)  Built-in redundancy to ensure a higher level of Service availability in the event of HNS equipment failure.

3)  Installation of the Equipment at the Facility.

4)  Provision and operation of the space segment of HNS's satellite, including its satellite transponder capacity.

5)  Equipment maintenance services specified in Schedule 2 of this Addendum.

The Equipment consists of :

1)  DW4010 outdoor satellite antenna, indoor equipment with two ethernet ports, two serial (RS-232) ports, and integrated 40 gigabyte hard drive and caching software license.

2)  Ethernet Hub (8 port), including up to 25' of ethernet cabling and connections per device for up to 2 separate devices

3)  Anti-icing equipment, where required.

SUPEXC1
166087 8/04

## SCHEDULE 2
## SUPPORT AND MAINTENANCE

You will receive the following maintenance and support services:

1) <u>Telephone Support</u>.  You may contact HNS' satellite control center 24 hours per day, 365 days per year by calling a toll free telephone access to receive Service support.

2) <u>Corrective Maintenance</u>.  If HNS determines that the Equipment is not operating properly, HNS will restore the Equipment to good working condition by performing the following corrective maintenance as required:

    a) Diagnostic testing to determine the existence and cause of the malfunction;
    b) Removal and replacement of any malfunctioning field replaceable Equipment ;
    c) Reorientation (repointing) of the antenna subsystem;
    d) Repair or replacement of Equipment interconnecting cables;
    e) Reloading initializing instructions and recommissioning;
    f) Verification of proper operation and completion of service report; and
    g) Notification to the you, us and the control center that the Equipment has been restored to operational status.

3) <u>Limitations</u>.  Maintenance services do not include any of the following services:

    a)  Maintenance, repair, or replacement of parts damaged or lost through catastrophe, accident, lightning, theft, misuse, fault, or negligence of the you or causes external to the Equipment, including failure of, or faulty, electrical power or air conditioning, operator error, failure, or malfunction of data communication we or HNS did not provide you, or from any cause other than intended and ordinary use.

    b)  Changes, modifications, or alterations in or to the Equipment by anyone other than HNS or us other than HNS-approved upgrades and configuration changes

    c)  Deinstallation, relocation, or removal of the Equipment or any accessories, attachments, or other devices

4) <u>Software Maintenance</u>.  HNS will correct reported defects in the Software that cause it not to substantially perform in accordance with its applicable specifications as promptly as commercially reasonable at no cost to Customer.

5)  Software Maintenance Service Limitations.  We and HNS have no responsibility to correct any defects in any Software that are caused by (i) modification of the Software by any person other than us or HNS; (ii) failure to install an update provided by us or HNS within 60 days after we or HNS provide it to you; (iii) misuse or improper installation by you; or (iv) problems in third-party hardware, software, or networking equipment which is manipulated by, interoperates with, or operates in conjunction with the Software.

1

SUPEXCI
166087 8/04

## ADDENDUM TO THE FRANCHISE AGREEMENT PURSUANT TO THE
## ILLINOIS FRANCHISE DISCLOSURE ACT

This Addendum to the Franchise Agreement by and between SUPER 8 MOTELS, INC. ("we", "our" or "us") and AMERICAN LODGING PARTNERS, INC. ("you") is dated NOV. 30 , 2004.

These provisions supersede anything to the contrary in the Franchise Agreement:

1. The Illinois Franchise Disclosure Act of 1987, as amended, applies to this transaction and supersedes any conflicting provision of the Franchise Agreement or New Jersey law.

2. Section 17.6.3 of the Franchise Agreement are amended by providing that all litigation by or between you and us, arising directly or indirectly from the franchise relationship, shall be commenced and maintained, at our election, in the state courts of Illinois or the United States District Court for Illinois with the specific venue, in either court system, determined by appropriate jurisdiction and venue requirements; the Franchise Agreement may, however, provide for arbitration in a forum outside of the State of Illinois.

3. The first and third sentences of Section 14.2 of the Franchise Agreement are deleted.

4. If any of the provisions of the Franchise Agreement are inconsistent with applicable state law, then the state law shall apply to the extent such law is constitutional and valid as applied.

5. The acknowledgment of receipt of a copy of the UFOC at least 10 business days before paying any fee or signing any contract with us is deleted from Section 17.7.1 of the Franchise Agreement. Section 17.7.4 of the Franchise Agreement is deleted.

6. Sections 17.7.2 and 17.7.3 are amended to read as follows:

"17.7.2   Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or included in the UFOC. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or included in the UFOC.

17.7.3   This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License except those contained in the UFOC."

7. All other rights, obligations, and provisions of the Franchise Agreement shall remain in full force and effect.  Only the Sections specifically added to or amended by this Addendum shall be affected.

1

This Addendum is incorporated in and made a part of the Franchise Agreement for the State of Illinois.

SUPEXC1
166087 8/04

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE**:
SUPER 8 MOTELS, INC.

ATTEST: _____                    By: _____
        (Assistant) Secretary                       Vice President


**YOU**, as franchisee:
AMERICAN LODGING PARTNERS, INC.

ATTEST: _____                    By: _____
                                                    (Vice) President

3

```
FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW

JFB
```

# EXHIBIT C

## GUARANTY

To induce Super 8 Motels, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                                    GUARANTORS:

_____          _____ (Seal)
                                                          Vivak Khanna

_____          _____ (Seal)
                                                          Dharam Vir

_____          _____ (Seal)
                                                          Desh P. Mehta

31

```
FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW

JFB
```

# EXHIBIT D

# SUPER 8 MOTELS, INC.

**Franchise Administration**

March 30, 2006

Mr. Ed Griffin
c/o Super 8 Motel
12808 South Ashland
Calumet Park, IL 60827

**<u>VIA OVERNIGHT COURIER</u>**

Re:    **NOTICE OF MONETARY DEFAULT relating to Super 8® Unit #8592-82945-2 located in Calumet Park, IL (the "Facility")**

Dear Mr. Griffin:

I write on behalf of Super 8 Motels, Inc. ("we," "our," or "us") regarding the Franchise Agreement dated November 30, 2004 between American Lodging Partners, Inc. ("you" or "your") and us (the "Agreement"). We write to give you formal notice that you are in default under the Agreement.

The Agreement requires you to timely pay us the Recurring Fees and other charges relating to your operation of the Facility under the System. Our Financial Services Department advises us that as of March 27, 2006 your account is past due in the amount of $56,075.37. We have enclosed an itemized statement detailing the fees past due. Under the Agreement, you have 30 days to pay this amount to us in order to cure your default. If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Super 8 System.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default. By copy of this letter, we are also informing your guarantors of your default as well any lender with which we have an agreement regarding the Facility.

We hope you will take this opportunity to restore your good standing under the Agreement. If you have any questions, please call Joseph Stokes, Financial Services Manager, at (973) 496-7011.

Sincerely yours,

Kathy Cox
Senior Director
Franchise Administration

Enclosure

cc:    Vivak Khanna (Guarantor)
    Dharam Vir (Guarantor)
    Desh P. Mehta (Guarantor)
    John Valletta
    Joseph Stokes

```
22445X     MAR 31, 2006    ACT WT  LTR        #PK 1
SERVICE 2DA                BILL WT  LTR
TRACKING# 1Z22445X0253443589      ALL CURRENCY USD
COST CENTER: 006-5072
REF 2: SENT BY COMPLIANCE

HANDLING CHARGE 0.00
REFERENCE RATE CHARGES:
DV 0.00                    SERVICE   4.75 USD
DC 0.00          COD  0.00        RS  0.00
AH 0.00          HZMT 0.00        SD  0.00
TOT REF CHG  4.75  NTFY 0.00      SP  0.00
                 REF+HANDLING     4.75
```

```
FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW

JFB
```

# EXHIBIT E



# SUPER 8 MOTELS, INC.

**Franchise Administration**

July 10, 2006

<u>**VIA OVERNIGHT COURIER**</u>

Mr. Ed Griffin
c/o Super 8 Motel
12808 South Ashland
Calumet Park, IL 60827

**Re:** **NOTICE OF CONTINUING MONETARY DEFAULT relating to Super 8® Unit #8592-82945-2 located in Calumet Park, IL (the "Facility")**

Dear Mr. Griffin:

I write on behalf of Super 8 Motels, Inc. ("we", "our" or "us") regarding the Franchise Agreement dated November 30, 2004, between American Lodging Partners, Inc. ("you" or "your") and us (the "Agreement"). You will recall that, on March 30, 2006, we sent you a default notice because of your failure to meet your financial obligations to us. That notice required you to cure the default within thirty days. However, you did not cure your default within the time permitted.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement (including your License to operate the Facility as a Super 8 facility) immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. Accordingly, we will allow you an additional period of 30 days from the date of this letter to cure your default. Please be advised that as of July 7, 2006 your account is now past due in the amount of $100,784.44. We have enclosed the statement detailing the fees past due. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period. We are simply giving you a final opportunity to avoid termination.

By copy of this letter, we are also informing your guarantors of your default.

We hope you will take this opportunity to resolve your monetary default. If you have any questions, please call Joseph Stokes, Financial Services Manager, at (973) 496-7011.

Sincerely yours,

Kathy Cox
Senior Director
Franchise Administration

Enclosure

```
22445X      JUL 10, 2006    ACT WT  LTR      #PK 1
SERVICE 2DA                 BILL WT LTR
TRACKING# 1Z22445X0252551884          ALL CURRENCY USD
COST CENTER: 006-5072
REF 2: SENT BY COMPLIANCE

HANDLING CHARGE 0.00
REFERENCE RATE CHARGES:            SERVICE  4.75 USD
DV 0.00         COD  0.00          RS   0.00
DC 0.00         HZMT 0.00          SD   0.00
AH 0.00         NTFY 0.00          SP   0.00
TOT REF CHG  4.75            REF+HANDLING   4.75
```

cc:   Vivak Khanna (Guarantor)
      Dharam Vir (Guarantor)
      Desh P. Mehta (Guarantor)
      John Valletta
      Joseph Stokes

1 Sylvan Way • Parsippany, New Jersey 07054 • 1-866-582-9104 • Fax 973-496-5345

```
FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW


JFB
```

# EXHIBIT F



# SUPER 8 MOTELS, INC.

Franchise Administration

```
22445X      AUG 11, 2006    ACT WT LTR        #PK 1
SERVICE 2DA                 BILL WT LTR
TRACKING# 1Z22445X0253696664          ALL CURRENCY USD
COST CENTER: 006-5072
REF 2: SENT BY COMPLIANCE

HANDLING CHARGE 0.00
REFERENCE RATE CHARGES:
DV 0.00                     SERVICE    4.90 USD
DC 0.00          COD  0.00      RS    0.00
AH 0.00          HZMT 0.00      SD    0.00
TOT REF  CHG  4.90   NTFY 0.00  SP    0.00
                     REF+HANDLING    4.90
```

:R

August 11, 2006

Mr. Ed Griffin
American Lodging Partner, Inc.
12808 South Ashland
Calumet Park, IL 60827

**RE:**   **Franchise Agreement, dated November 30, 2004, (the "Agreement") between American Lodging Partner, Inc. ("you" or "your") and Super 8 Motels, Inc. ("we", "our" or "us") for the Super 8® lodging facility located at Calumet Park, IL / #8592-82945-2 (the "Facility")**

Dear Mr. Griffin:

We write to give you formal notice of the termination of the License granted under the Agreement to operate the Facility as part of the Super 8 System (the "Notice"). This termination is a result of your failure to cure your default under the Agreement, due to your failure to meet your financial obligations. The termination of your Agreement is effective as of August 11, 2006 (the "Termination Date").

Because your License is terminated, you must now perform your post-termination obligations such as removal of all items that display or refer to the Super 8 brand at the Facility. The de-identification procedures are specified in the attachment to this letter. These de-identification procedures must be completed within 14 days after the date of this Notice.

You must also immediately pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of August 4, 2006, you owe us $118,156.28 in Recurring Fees. This amount is described in more detail in the attached itemized statement. Additionally, you must pay us Liquidated Damages of $216,788.40 as specified in the Agreement.

Mr. Ed Griffin
August 11, 2006
Page Two

Please know that, because your License has terminated, you also have lost your right to continue to use the seamless interface version of the Project Power Up property management system. You must now make your own arrangements with the software vendor for a new license, as stated in your Software & Services Agreement.

If within the 14 day period described above, you do not timely remove the exterior signage which bears the Super 8 name and marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us. If you object to the removal of the signage by our independent contractor, you must notify us within 14 days of the date of this letter.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to all of your guarantors.

If you have any questions regarding your obligations under this letter, please contact Randi Siouffi, Manager of Settlements, at (973) 496 - 5662.

Sincerely,

Valerie Capers Workman
Vice President
Franchise Administration

Enclosures

cc:    Levenna Jackson (Site Principal)
       Dharam Vir (Guarantor)
       Desh P. Mehta (Guarantor)
       Vivak Khanna (Guarantor)
       John Valletta
       Randi Siouffi

```
FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW

JFB
```

# EXHIBIT G



```
22445X    FEB 14, 2007    ACT WT LTR         #PK 1
SERVICE 2DA                 BILL WT LTR
TRACKING# 1Z22445X0252865349    ALL CURRENCY USD
COST CENTER: 006-5072
REF 2: SENT BY COMPLIANCE

HANDLING CHARGE 0.00
REFERENCE RATE CHARGES:
DV 0.00                 COD  0.00    SERVICE  10.73 USD
DC 0.00                 HZMT 0.00    RS       0.00
AH 0.00                 NTFY 0.00    SD       0.00
TOT REF CHG  10.73                   SP       0.00
                        REF+HANDLING          10.73
```

February 14, 2007

Mr. Ed Griffin
American Lodging Partners, Inc.
12808 South Ashland
Calumet Park, IL 60827

Re:     **Terminated Franchise Agreement dated: November 30, 2004**
        **Terminated: August 11, 2006**
        **Unit No. 8592-82945-2 located in Calumet Park, IL ("Facility")**
        **Franchisee: American Lodging Partners, Inc. ("you" or "your")**

Dear Mr. Griffin:

        Separately, Super 8 Motels, Inc. sent a formal notice to you that the license to operate the Facility as part of the Super 8® chain terminated on the date stated above. As a result of the termination, the Franchise Agreement now compels you to remove from the Facility all of the items associated with the Super 8 brand, so it cannot be confused with a Super 8 guest lodging facility.

        Specifically, Super 8 Motels, Inc. demands that you immediately cease all use of the Super 8 trade names, trademarks and service marks (collectively, the "Marks"), including but not limited to the use of the Marks in domain names, metatags, sponsored Internet search engine results, web sites, e-mail addresses, signs, and any other means which might suggest that the Facility continues to be affiliated with the Super 8 brand. You must also return to Super 8 Motels, Inc. all documents, instructions, operating manuals, guest comment cards, stationery, and all other items which bear any of the Super 8 Marks. All billboard signs, interior signs, exterior signs (whether located on or off the premises), entrance signs, as well as listings in telephone directories, the internet, travel guides, hotel indices, or similar guides in which the Facility is identified as a Super 8 facility must be changed.

        **Under Section 13.2 of the Franchise Agreement, we will be sending an independent contractor to the Facility to remove all signage at and around the Facility that bears the Super 8 Marks.** We have negotiated favorable rates with the contractor to remove the signage. The cost of sign removal will be added to your final invoice from us. If you arrange for your own sign contractor to remove the signage within the time specified in the

Mr. Ed Griffin
February 14, 2007
Page 2


Franchise Agreement, or you object to the removal of the signage by our vendor, you must notify us in writing within fourteen (14) days after the date of this letter. Otherwise, we will confirm the date and time that the contractor will remove the signage from the Facility in a letter to you.

Your continued use of the Marks causes confusion among consumers as to the continued affiliation of the Facility with the Super 8 brand and harms its current licensees. Accordingly, your continued use of the Marks constitutes willful trademark infringement, unfair competition, dilution and counterfeiting in violation of state and federal laws. Your continued use of the Marks breaches the obligations you undertook in the Franchise Agreement.

Your continuing infringement upon Super 8 Marks is a serious matter. Accordingly, we expect you to complete the identity change of the Facility promptly. However, if de-identification is not completed, Super 8 Motels, Inc.    will have no choice but to pursue legal remedies to compel the removal of all items bearing the Super 8 Marks and to recover appropriate damages.

If you have any questions regarding this letter, please contact Carole Lennon, Manager of Trademark Compliance, at (973) 753-7251.

Very truly yours,

Valerie Capers Workman
Vice President
Franchise Administration



cc:    Levenna Jackson (Site Principal)
       John Valletta
       Carole Lennon

```
FILED: AUGUST 8, 2008
08CV4514
JUDGE DOW
MAGISTRATE JUDGE DENLOW

JFB
```

# EXHIBIT H



**PERSONA**
™
**A Division of Sign Up Company**
700 - 21st Street Southwest
PO Box 56
Watertown, SD 57201-0056
Telephone: 800-843-9888
Toll Free Fax: 800-843-9890

# Invoice

| | |
|---|---|
| Invoice No: | 151728 |
| Date: | 04/25/07 |
| Project - Option: | 40199 - 1 |
| Sales Representative: | Melissa Pulscher Nash |

**Bill To:**    13912
Wyndham Corporation-Quality Dept
Carole Lennon - Mgr Trademark Compliance
Wyndham Hotel Group
PARSIPPANY, NJ  07054
Attn:   Carole Lennon

**Ship To:**
Wyndham Corporation-Quality Dept
1130 N Garfield

LOMBARD, IL  60148

| Order # | PO # | Location | Terms |
|---|---|---|---|
| 59810 | | 8592 - CALUMET PARK, IL  60827<br>Site #8592 - Super 8<br>12808 South Ashland | Net 30 |

| Qty | Signage | Unit Price | Total |
|---|---|---|---|
| 1 | Removal of Super 8 faces | .00 | .00 |
| | | Signage Subtotal: | .00 |

Removal                                                              1,500.00
Sales Tax                                                                    .00

| | |
|---|---|
| Subtotal: | $1,500.00 |
| Less Prepaid Deposit: | $.00 |
| **Total:** | $1,500.00 |

To ensure proper credit please
reference invoice # with payment.

Interest of 1-1/2% per month will be
billed to all overdue accounts.

=====================

*Thank You!*